[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12249
_____

D. C. Docket No. 0:10-cv-61985-WPD

GARDEN-AIRE VILLAGE SOUTH CONDOMINIUM
ASSOCIATION, a Florida Corporation,

Plaintiff – Appellant,

versus

QBE INSURANCE CORPORATION,
a Pennsylvania Corporation,

Defendant – Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(December 23, 2014)

Before MARTIN, Circuit Judge, and EATON,[*] Judge, and HINKLE,[**] District
Judge.

---

[*] Honorable Richard K. Eaton, United States Court of International Trade Judge, sitting
by designation.
[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of
Florida, sitting by designation

HINKLE, District Judge:

An insured who disagrees with a property insurer's determination of the amount of a covered loss may have a right under the insurance policy to compel an appraisal. In this action to compel an appraisal, the parties have debated recurring questions of Florida law. The recurring questions include these: if the insured does not comply with the policy's terms on things like submitting to an examination under oath or providing an inventory of—or otherwise identifying—the damaged property, may the insured nonetheless compel an appraisal? Does the answer depend on whether the noncompliance prejudiced the insurer? If so, who has the burden of proof on the prejudice issue?

After a bench trial, the district court ruled for the insurer. On the unusual facts of this case, this was the correct result, regardless of which side is correct on the recurring legal questions. We affirm.

I

Garden-Aire is a 7-story, 126-unit condominium complex in Pompano Beach, Florida. The complex includes a main building and a separate clubhouse. The appellant Garden-Aire Village South Condominium Association, Inc. is responsible for maintaining the complex. The Association obtained insurance coverage from the appellee QBE Insurance Corporation. On October 24, 2005, while the policy was in effect, Hurricane Wilma damaged the complex.

2

On October 25, 2005, the Association provided QBE a written notice of loss, asserting there was damage to the buildings, roofs, windows, and fences.  On November 2, 2005, an adjuster preliminarily inspected the property.  He noted damage, some of which had already been repaired.  The adjuster contacted an expert—a building engineer—to obtain a better assessment of the roofs.  The adjuster also expected to obtain from the Association a further indication of any damage not visible from the initial inspection.

By January 24, 2006, the adjuster had received no further specification of damages from the Association.  The Association had spent $12,000 to repair screens and $16,000 to repair the roofs.  Based on information received to that point, the adjuster later estimated total damages at $45,940.57, not including any interior damage (the adjuster had not yet inspected the interior) and not including any further roof damage (the engineer had not yet inspected the roof).  The estimate included the full $16,000 in completed roof repairs, even though the contractor who did the work attributed only about half of that amount to the hurricane.

On January 24, the adjuster called the Association's president.  The president told the adjuster that the Association "had made various repairs and that the damages would be well below the deductible."  The deductible was $255,355, many times higher than the damages calculated to that point.   The president

3

expressly withdrew the Association's claim.  The adjuster sent the president a letter confirming the withdrawal, and the adjuster canceled the engineer's planned inspection of the roof.  So far as QBE knew, the matter was at an end.

On December 14, 2006, more than a year after the hurricane, the Association applied for insurance with an unrelated insurer.  The Association said the complex had no unrepaired damage and had suffered no insurance loss within the prior two years (an accurate statement if, as appeared to be the case, the damage from Hurricane Wilma was below the deductible).

In April 2010, more than four years after the hurricane, the Association began replacing the main building's roof.

In the summer of 2010, a public adjuster, who was cooperating with an attorney, made an unsolicited visit to the Association, asking to investigate a possible claim against QBE.  The Association accepted the entreaty.

On October 18, 2010, the Association filed this action, demanding an appraisal of the damage caused by Hurricane Wilma.  This was QBE's first indication that the Association's express withdrawal of its claim on January 24, 2006, did not end the matter.

II

4

The policy is written in the first person from QBE's perspective.  It thus refers to QBE as "we" and the Association as "you."  The policy requires the Association to "see that the following are done in the event of loss or damage" to the complex:

> . . . .
>
> (2)     Give us prompt notice of the loss or damage.  Include a description of the property involved.
>
> . . . .
>
> (5)     At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of loss claimed.
>
> . . . .
>
> (7)     Send us a signed, sworn proof of loss containing the information we request to investigate the claim.
>
> . . . .
>
> (8)     Cooperate with us in the investigation or settlement of the claim.

The policy adds: "We may examine any insured under oath . . . about any matter relating to this insurance or the claim . . . ."  The policy says that legal action cannot be brought against QBE unless there has been "full compliance" with all the policy's terms.

The policy also includes an appraisal provision: "If we and you disagree on the value of the property or the amount of loss, either may make written demand

5

for an appraisal of the loss." The policy sets out the procedures that will govern an appraisal.

III

After filing this lawsuit, the Association provided a sworn proof of loss, but it included amounts that plainly should not have been included: the roofing contractor's estimate for repairing damage the contractor said was unrelated to the hurricane; the cost of replacing every window in the complex, including those that were not damaged; and the cost of replacing the windows with higher-cost "impact" glass rather than with glass of the original quality. The Association refused to provide an inventory of damaged property—asserting the policy's requirement to provide an inventory did not apply to buildings or their components—and did not otherwise identify the damaged windows. The Association said the proof of loss should not be taken as a representation that the identified losses in fact resulted from Hurricane Wilma.

The Association produced its current president for an examination under oath. But he knew virtually nothing about the claim, having come to the Association after the hurricane, and having made no effort to learn even the most basic information about the claim. So QBE faced a claim that was asserted roughly five years after the hurricane, after significant repairs, from a now uncooperative insured who refused to provide even basic information about the

6

damage purportedly caused by the hurricane and who submitted a sworn proof of loss but simultaneously disclaimed its reliability. The Association asserted then, and asserts now, that the obligation to figure out what was damaged fell solely to QBE.

## IV

After the bench trial, the district court entered thorough and accurate findings of fact. The court addressed the significant legal issues raised by the recurring pattern of a claim and an insured's alleged failure to comply with terms of the policy. The issues are governed by Florida law. And the Florida authorities do not all point one way.

When the issue is whether an insured may compel an appraisal despite the insured's failure to comply with the policy's terms, there are at least three possible approaches.

First, at least when, as here, the policy explicitly calls for this result, the rule could be that an insured must comply with the policy's terms and cannot compel an appraisal without doing so. See U.S. Fid. & Guar. Co. v. Romay, 744 So. 2d 467, 471 (Fla. 3d DCA 1999) (en banc) ("No reasonable and thoughtful interpretation of the policy could support compelling appraisal without first complying with the post-loss obligations."); see also Goldman v. State Farm Fire Gen. Ins. Co., 660 So. 2d 300, 306 (Fla. 4th DCA 1995) (holding that an

examination under oath was "a condition precedent to suit" under a homeowner's policy and that the insured's failure to comply "preclude[d] an action on the policy regardless of a showing of prejudice by the insurer").

Second, the rule could be that an insured may compel an appraisal if the insured shows that the failure to comply with the policy's terms caused no prejudice. See, e.g., Bankers Ins. Co. v. Macias, 475 So. 2d 1216, 1218 (Fla. 1985) (holding that a presumption of prejudice arises from an insured's failure to give timely notice of a claim and that an insured thus cannot recover unless the insured proves lack of prejudice); Rodrigo v. State Farm Fla. Ins. Co., 144 So. 3d 690, 692 (Fla. 4th DCA 2014) (holding that an insured who failed to submit a timely proof of loss could not recover under a homeowner's policy because the insured did not rebut the presumption that the insurer suffered prejudice); Soronson v. State Farm Fla. Ins. Co., 96 So. 3d 949, 952-53 (Fla. 4th DCA 2012) (same).

Or third, the rule could be that an insured may compel an appraisal unless the insurer shows that the failure to comply with the policy's terms caused prejudice. For this proposition the Association cites State Farm Mutual Automobile Insurance Co. v. Curran, 135 So. 3d 1071 (Fla. 2014), though that case involved a compulsory medical examination for uninsured-motorist coverage—a requirement the court held not to be a condition precedent to suit—and only three justices joined the opinion on which the Association relies. See also Whistler's

8

Park, Inc. v. Fla. Ins. Guar. Ass'n, 90 So. 3d 841, 845 (Fla. 5th DCA 2012)

(holding that the failure of an insured under a homeowner's policy to sit for an

examination under oath precludes recovery only if the insurer proves prejudice).

The choice among these approaches makes no difference here. When the

Association filed this lawsuit seeking to compel an appraisal, it had no pending

claim with QBE, and there was no pending disagreement about the amount of loss

caused by the hurricane. Especially given the unusual factual background, QBE's

requests for information and a meaningful examination under oath were

reasonable. The Association stonewalled. It even refused to stand behind its own

(plainly inaccurate) proof of loss. The district court found as a fact that the

Association's failure to comply with its obligations under the policy caused

prejudice—QBE had to go through the entire complex looking for damage, without

guidance, more than five years after the storm. If not a search for a lost city, it

must have seemed close. The district court's finding of prejudice is not clearly

erroneous.

The Association says looking for damage was QBE's obligation and that the

Association owed QBE nothing more. But when, through no fault of the insurer,

more than five years have passed and substantial evidence has been lost to time, an

insured's failure to comply with the policy's post-loss obligations cannot be so

easily explained. The policy provides for an appraisal when the parties are unable

9

to agree on the amount of a loss.  Here the Association prevented QBE from getting to that point.

On any view of Florida law, the district court correctly ruled that the Association was not entitled to an appraisal.

V

The Association says that even if its claim for an appraisal was properly rejected, the judgment should be altered to make clear that the Association will not be precluded from bringing a new claim for an appraisal if, before doing so, it complies with the policy's terms.  The Association says that under Florida law, the Association will be allowed to bring such a new claim.  That may or may not be so, but either way, Florida law does not require alteration of this judgment.

First, in Romay, the en banc Third District Court of Appeal addressed three separate actions in which an insured failed to comply with a policy's terms but sought to compel an appraisal.  The trial courts ruled for the insureds in two cases but for the insurer in the third.  The Third District held that the insureds were not entitled to compel an appraisal.  The court remanded the two cases in which the trial courts had ruled for the insureds, directing the trial courts to allow the insureds to comply with the policies and again seek an appraisal, as part of the same action.  But in the third case—the one in which, as in our case, the trial court entered judgment for the insurer—the Third District affirmed.  The case ended.  744 So. 2d

10

at 471.  Our disposition here tracks <u>Romay</u> by affirming the judgment for the insurer.

Indeed, the grounds for affirming the judgment are stronger here than in <u>Romay</u>, because here the case has been tried on the merits.  The disposition of two of the actions in <u>Romay</u> indicates at most that a court applying Florida procedural law may allow an insured to cure its failure to comply with the policy's conditions before judgment is entered for the insurer.  The disposition of the third action in <u>Romay</u> shows that the same is not true after judgment is entered for the insurer.  And even more clearly, <u>Romay</u> does not mean that a court applying federal procedural law must, after a bench trial and entry of judgment for the insurer, allow an insured to cure a failure to comply with the policy's terms.

Our ruling also tracks the treatment of this issue in the litigation that culminated in <u>Chimerakis v. Sentry Insurance Mutual Co.</u>, 804 So. 2d 476 (3d DCA 2001) ("<u>Chimerakis II</u>").  When that litigation first reached the Third District, the insured had not complied with the policy's terms, and the court rejected the insured's appraisal claim, citing <u>Romay</u>.  <u>Chimerakis v. Sentry Ins. Mut. Co.</u>, 744 So. 2d 1250 (Fla. 3d DCA 1999) ("<u>Chimerakis I</u>").  The insured later complied with the policy's terms and brought a second action to compel an appraisal.  The Third District held that this was proper—that the judgment in the first case did not preclude the second case, at least in part because the insured had

11

relied on later-rejected Florida authority in initially seeking to compel an appraisal without complying with the policy's terms. Chimerakis II, 804 So. 2d at 479.

The Association says Chimerakis II indicates that the judgment in our case will not be binding in a later case. QBE disagrees, asserting that Chimerakis II is different because there the insured complied with the extant Florida law at each step of the process. Either way, the critical point here is what the Third District did in Chimerakis I—that is, on the first appeal, the one that is procedurally analogous to our case. On the first appeal, the Third District affirmed the judgment for the insurer. 744 So. 2d at 1250. We do the same.

## VI

As set out above, on the unusual facts of this case, and on any proper view of Florida law, the district court properly rejected the Association's demand for an appraisal. The judgment is affirmed.